# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF IOWA
# DAVENPORT DIVISION

| | | |
|---|---|---|
| DORA BRUBAKER, THOMAS BLOSCH, MICHAEL STOHLMEYER, JANET HARVILLE, MARK MULVEHILL, DIANA NIELSON, R. RONALD NICHOLS and JUDITH PULS, individually and on behalf of all others similarly situated, | * * * * * * * | CIVIL NO. 3:08-CV-00113-CRW-TJS |
| Plaintiffs, | * * | **MEMORANDUM OPINION AND JUDGMENT FOR DEFENDANTS** |
| v. | * * | |
| DEERE & COMPANY, et al., | * * | |
| Defendants. | * | |

## I.  INTRODUCTION

Three retirees of Deere & Company ("Deere") filed this class action lawsuit against their former employer because of changes Deere made to their medical benefits, effective January 1, 2008.  Deere manufacturers heavy equipment for use in the agriculture, construction, forestry and landscaping sectors, and has facilities worldwide including several within the jurisdiction of this court.  Deere employs thousands of salaried, union and nonunion wage employees throughout its operations.

The retirees who initiated this litigation believe Deere made repeated promises of lifetime medical benefits while they were salaried employees.  They contend the changes made by Deere in January 2008 breached those promises and have left retirees without the medical benefits they enjoyed as active employees and thought they could carry into

retirement.  Their claims are brought primarily under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*  They seek to restore their medical benefits and to enjoin Deere from reducing or eliminating retiree medical benefits in the future.

The retirees contend Deere adopted and communicated company-wide policies and made promises that salaried and non-union wage employees who met certain retirement eligibility requirements would have vested rights to receive, throughout their retirement, medical benefits they had as active employees at the time of retirement.  According to the retirees, oral promises and representations were made company wide: at the time of their hiring; during annual performance reviews; and in group and individual meetings related to their benefits.  The retirees believe they have vested rights to receive the promised medical benefits, both under written plan documents and through the oral promises and representations made by Deere.  They allege Deere made improper changes in benefits in 1993 and then drastically eliminated promised benefits when it instituted the Healthy Directions program effective January 1, 2008.

In response to plaintiffs' pleaded claims, Deere denies that its managers made the alleged promises of lifetime fixed medical benefits.  Responding to the retirees' claims, Deere emphasizes that the controlling plan documents, including the John Deere Pension Plan for Salaried Employees ("Salaried Pension Plan"), the John Deere Health Benefit Plan for Salaried Employees ("Salaried Health Plan") and the applicable Summary Plan Descriptions ("SPDs"), unambiguously reserved to Deere the right to change benefits as it deems appropriate.

While Deere believes there is no need to resort to evidence outside the written plan documents, Deere contends that extrinsic evidence underscores Deere's right to make changes in the medical benefits.  Deere points to evidence concerning the understanding of plan fiduciaries, Deere managers' constant review of and modifications to the plans, annual correspondence to participants, and even some of the plaintiffs' own testimony.  Deere contends it gave sufficient notice of the impending changes to all retirees in October of 2005, more than two years before January 1, 2008.  Deere also contends all employees were informed and knew Deere could change the medical plans, had modified benefits in recent years, and always reserved the right to terminate, amend or modify retiree medical benefits. In Deere's view, retirees could not reasonably rely on any oral representations that were contrary to the written plan language itself.

After expedited discovery was completed, the court held a bifurcated bench trial beginning September 21, 2009, and concluding October 2, 2009, addressing only liability issues.  Counsel for the parties presented oral arguments to the court on October 13, 2009. The court commends counsel for excellent evidentiary submissions and oral summations that thoroughly addressed all liability issues.  After careful consideration of the parties' claims and defenses as to liability, and as further explained below, this court concludes judgment must be entered in favor of Deere on all claims brought by the plaintiffs, with taxable costs to be paid by plaintiffs.

Before addressing the testimony and other evidence presented at trial, and the conclusions of law reached upon that evidence, the court first sets forth in more detail how this case was made ready for trial.

## II.  PROCEDURAL BACKDROP

Plaintiffs Dora Brubaker, Thomas Blosch, and Michael Stohlmeyer filed their Class

Action Complaint (Document No. 1) on September 10, 2008.  Plaintiffs brought the case

under ERISA to restore health benefit plans, to recover retiree health benefits due, and to

enjoin defendants from reducing or eliminating retiree health benefits in violation of ERISA

and the terms of the relevant plans. (*Id.* ¶ 1.)[1]  Plaintiffs Brubaker, Blosch and Stohlmeyer

brought the action individually and on behalf of former salaried and non-union wage

employees of Deere who retired on or after July 1, 1993, and who were participants in

Deere's plans, together with their eligible spouses and dependents. (*Id.* ¶ 8.)

The complaint named as defendants Deere & Company as plan administrator and

---

[1]  As identified by plaintiffs in the complaint, the plans at issue include:

John Deere Health Benefit Plan for Salaried Employees ("Salaried Employees Plan"); John Deere Health Benefit Plan for Retired Salary and Retired Non-Union Wage Employees ("Salaried Retirees Plan"); John Deere Pension Plan for Salaried Employees ("Pension Plan"); or one of the employee benefit plans denominated a "special early retirement benefit program" provided by Deere & Company or its predecessors or subsidiaries or participating companies from 1993 through 1996 ("Deere") including, without limitation: the 1993 Special Early Retirement Program for Salaried Employees ("1993-SERP"); Deere 1994 Special Early Retirement Program for Salaried Employees ("1994-SERP"); Deere 1996 Special Early Retirement Program for Salaried Employees ("1996-SERP"); Deere 1997 Special Early Retirement Program for Salaried Employees ("1997-SERP"); Deere 1998 Special Early Retirement Program for Salaried Employees ("1998-SERP"); Deere 1999 Special Early Retirement Program for Salaried Employees ("1999-SERP"); Deere 2000 Special Early Retirement Program for Salaried Employees ("2000-SERP"); Deere 2001 Special Early Retirement Program for Salaried Employees ("2001-SERP"); Deere 2001 Construction and Forestry Division Voluntary Separation Program ("2001-VSP"); Deere 2002 Special Early Retirement Program for Salaried Employees ("2002-SERP"); Deere 2005 Special Early Retirement Program for Salaried Employees ("2005-SERP"); and Deere 2006 Special Early Retirement Program for Salaried Employees ("2006-SERP").

(*Id.* ¶ 8.)

named fiduciary of the several plans at issue and the plans themselves.[2]   The court's references to "Deere" throughout this opinion is a reference to all defendants named in the complaint.

The plaintiffs' complaint contained four counts: Count I - Violations of ERISA and the Terms of the Plans; Count II - Breach of Fiduciary Duty; Count III - Equitable Estoppel Under Federal Common Law; and Count IV - Violations of ERISA Disclosure Requirements, Claims Procedure Requirements and Applicable Regulations.   Plaintiffs seek injunctive, declaratory and equitable relief for the alleged violation of ERISA and the terms of the plans, the breach of fiduciary duty and equitable estoppel.   Plaintiffs clarified during oral summations on October 13 that their estoppel claims are rooted in both equitable and

---

[2]   The complaint identified defendants as: Deere & Company, Plan Administrator and Named Fiduciary of the John Deere Health Benefit Plan for Salaried Employees; John Deere Health Benefit Plan for Salaried Employees; Plan Administrator of the John Deere Health Benefit Plan for Retired Salary and Retired Non-Union Wage Employees; Named Fiduciary of the John Deere Health Benefit Plan for Retired Salary and Retired Non-Union Wage Employees; John Deere Health Benefit Plan for Retired Salary and Retired Non-Union Wage Employees; Plan Administrator of the John Deere Pension Plan for Salaried Employees; John Deere Pension Plan for Salaried Employees; Named Fiduciary of the John Deere Pension Plan for Salaried Employees; John Deere Pension Plan for Salaried Employees; Deere & Company as Plan Administrator and Named Fiduciary of each of the Deere & Company Special Early Retirement Programs and the 2001 Construction and Forestry Division Voluntary Separation Program; the 1993 Special Early Retirement Program for Salaried Employees; Deere 1994 Special Early Retirement Program for Salaried Employees; Deere 1996 Special Early Retirement Program for Salaried Employees; Deere 1997 Special Early Retirement Program for Salaried Employees; Deere 1998 Special Early Retirement Program for Salaried Employees; Deere 1999 Special Early Retirement Program for Salaried Employees; Deere 2000 Special Early Retirement Program for Salaried Employees; Deere 2001 Special Early Retirement Program for Salaried Employees; Deere 2001 Construction and Forestry Division Voluntary Separation Program; Deere 2002 Special Early Retirement Program for Salaried Employees; Deere 2005 Special Early Retirement Program for Salaried Employees; Deere 2006 Special Early Retirement Program for Salaried Employees; Plan Administrator of Deere & Company Welfare Benefit Trust No. 2; Named Fiduciary of Deere & Company Welfare Benefit Trust No. 2; Deere & Company Welfare Benefit Trust No. 2.

promissory estoppel, and the court has considered whether either theory has been proved. Plaintiffs also seek injunctive and declaratory relief, and statutory penalties, for Deere's alleged violation of ERISA disclosure requirements and Deere's failure to provide plaintiffs plan documents relevant to their claims.

Since the filing of the complaint, the parties and the court have together worked to expedite trial and ensure that the parties' claims and defenses could be considered and resolved in a timely and just manner. Already on October 16, 2008, plaintiffs filed a Motion for Preliminary Injunction (Document No. 29), seeking injunctive relief to prevent alleged irreparable harm stemming from the changes made on January 1, 2008, to their medical benefits. Plaintiffs argue those changes by Deere breached fiduciary duties owed to plaintiffs and violated ERISA principles governing the terms of applicable pension and health and welfare benefit plans, including the terms of special early retirement programs ("SERPs"). Then on October 30, 2008, plaintiffs filed their Motion for Class Action Certification and for Appointment of Class Counsel (Document No. 50), seeking certification of the class and subclasses set forth in Counts I, II and IV of the complaint pursuant to Federal Rule of Civil Procedure 23.

The court held an initial hearing on the motion for preliminary injunction, receiving evidence both on October 31, 2008, at the United States Courthouse in Des Moines (see Clerk's Court Minutes (Document No. 53)), and thereafter on December 5, 2008, in the Courthouse in Davenport, Iowa. (*See* Clerk's Court Minutes (Document No. 77).) Counsel also presented oral arguments on the motion to certify the class. (*Id.*)

On December 8, 2008, the court entered an Order Denying Preliminary Injunction

(Document No. 83). The court found that an early trial and final judgment on the merits, not interim injunctive relief, was called for in this case. (*Id.* at 2.)  The parties were directed to work closely with Chief Magistrate Judge Thomas J. Shields during regular status conferences to arrange for early completion of discovery and expedited preparation for trial. (*Id.* at 4.)  The court also entered an Order Concerning Class Action Status (Document No. 84).  The court wrote that the claims of Count I and Count IV would be appropriate for a class action trial but doubted Counts II and III could be decided efficiently in a class action. (*Id.* at 2.)  Counsel for the parties were directed to confer to reach agreement on an order the court could enter certifying an appropriate class under Rule 23. (*Id.* at 3.)  The court also noted plaintiffs should consider adding to the named class representatives one or two persons typical of more of the many retirees covered by the plans at issue. (*Id.* at 2.)

On December 24, 2008, the parties submitted a Stipulation and Order Regarding Class Action Certification of Counts I and IV and Appointment of Class Counsel (Document No. 91).  As set forth in the parties' Stipulation, the class of persons sought to be certified is defined as

> [a]ll former salaried and non-union wage employees of Deere who retired on or after July 1, 1993 and who, at the time of retirement, were eligible to receive medical and other health benefits under the John Deere Health Benefit Plan for Retired Salary and Retired Non-Union Wage Employees ("Salaried Retirees Plan"), or one of the "Plans" defined in the Complaint including the John Deere Health Benefit Plan for Salaried Employees ("Salaried Employees Plan"), the John Deere Pension Plan for Salaried Employees ("Pension Plan"), the Deere & Company Welfare Benefit Trust No. 2 ("Welfare Benefit Trust"), and any of the 1993, 1994, 1996-2002, 2005 or 2006 Special Early Retirement Programs for Salaried Employees or the Deere 2001 Construction and Forestry Division Voluntary Separation Program ("SERPs"), and the eligible spouses and dependents of such retirees.

Subclass 1: Members of the Class who had five years or more of service and/or who were eligible to retire under the Pension Plan as of July 1, 1993 and their eligible spouses and dependents.

Subclass 2: Members of the Class who retired under one of the SERPs and their eligible spouses and dependents.

(*Id.* ¶ 4.)  There are approximately five thousand class members. (*Id.* ¶ 5.)

On December 26, 2008, the court accepted and adopted that stipulation thereby certifying the claims and issues raised in Counts I and IV of the complaint for class treatment under Rule 23. (*See* Text Order (Document No. 95).)  The parties did not reach agreement on Count II (Breach of Fiduciary Duty) and submitted separate proposed orders on the issue. (*See* Document Nos. 97 & 98.)  Plaintiffs have not moved for class certification on Count III (Estoppel).

Simultaneous with the parties' stipulation on class action certification, defendants filed a Partial Motion for Summary Judgment as to Counts I-III of the Complaint (Document No. 94).  In response, on January 16, 2009, plaintiffs filed a Motion for Rule 56(f) Denial of Defendants' Partial Motion for Summary Judgment, or in the Alternative, a Continuance of Summary Judgment Proceedings (Document No. 106).

After hearing on the matter, the court granted plaintiffs' request for continuance of the briefing on defendants' motion for partial summary judgment. (Order (Document No. 114).)  While recognizing the importance to all parties of achieving an early resolution on the merits, the court held that plaintiffs should be allowed to complete discovery on summary judgment issues.  The court ordered all discovery to be completed by June 30, 2009, set a hearing on defendants' motion for August 4, 2009, and scheduled a bench trial on any issues

remaining after summary judgment rulings to begin September 21, 2009. (*Id.* at 2.)

On March 9, 2009, Chief Magistrate Judge Shields entered an Order (Document No. 121) granting the parties' Joint Motion for Bifurcation of Liability and Damages for Trial and Discovery. The parties were to complete discovery on liability matters by June 30, 2009, and be prepared to proceed on liability issues at trial on September 21, 2009. (*Id.* at 3.) A proposed schedule for the damages portion of the case was to be submitted by the parties, if necessary, after trial on liability. (*Id.*)

On May 8, 2009, plaintiffs submitted a Motion for Leave to File Amended Complaint to Add Additional Plaintiffs (Document No. 136). Plaintiffs sought to file an amended complaint adding 49 individuals as named plaintiffs to Counts II and III, and adding five of those individuals as named class representatives to Counts I and IV. In an Order (Document No. 143) entered May 21, 2009, Chief Magistrate Shields granted plaintiffs leave to add Janet Harville, Mark Mulvehill, Diana Nielson, R. Ronald Nichols and Judith Puls as named class representatives to Counts I and IV; but the court denied the request to add 49 individuals as named plaintiffs to Counts II and III. In compliance with that Order, plaintiffs filed their First Amended Class Action Complaint (Document No. 145) on June 3, 2009. The amended complaint contains the same four counts as set forth in the initial complaint: Violations of ERISA and the Terms of the Plans (Count I ); Breach of Fiduciary Duty (Count II); Equitable Estoppel Under Federal Common Law (Count III); and Violations of ERISA Disclosure Requirements, Claims Procedure Requirements and Applicable Regulations (Count IV). Defendants filed their Answer (Document No. 148) to the amended complaint on June 17, 2009.

On July 3, 2009, defendants filed a Motion to Dismiss Count IV of Plaintiffs' Amended Complaint (Document No. 152).  Then, on July 17, 2009, defendants filed a Renewed Motion for Partial Summary Judgment as to Counts I-III of the Amended Complaint (Document No. 156).  Plaintiffs subsequently filed their own Motion for Partial Summary Judgment on Counts I, II and IV (Document No. 158).

The court heard oral arguments on the dispositive motions on August 4, 2009 (see Clerk's Court Minutes (Document No. 177)), and entered an Order Denying Cross Motions for Summary Judgment (Document No. 186) on August 21, 2009, keeping the liability issues on track for the scheduled September 21 two-week bench trial.[3]  All evidence was presented by October 2, but the court granted the parties' request to present closing arguments on October 13, 2009.  The case is now ready for a final decision and judgment on liability issues.

## III.  FACTS

The court makes the following findings of pertinent facts based on the parties' stipulations, the voluminous exhibits, and the considerable testimony of witnesses, in person and by deposition.  The court has found the testimony of plaintiffs concerning their claims quite vague in most respects and less credible than the testimony of the witnesses presented by defendants and the plan documents that corroborate those witnesses' testimony.

### A.  Flexible Benefits Program Introduced in 1993

As set forth by Deere in plan documents, and confirmed by the testimony of many

---

[3]  In addition to these and other formal filings, and throughout these proceedings, the parties and Chief Magistrate Judge Shields participated in several telephonic status conferences to address discovery and other matters necessary to prepare for trial.

retirees, Deere plainly had "a strong tradition of offering its employees an excellent benefits program." (1993 SPD (Ex. 3005).)  For years, Deere employees enjoyed full health care coverage without premiums, deductibles or co-payments.  Deere's medical benefit plan changed, however, with the introduction of a new flexible benefits program in 1993.  In a letter dated September 17, 1992, Deere announced that, effective July 1, 1993,  there would be "several major changes to the benefits program for salaried employees." (September 17, 1992 Letter (Ex. 45.) at p. 2.)  The letter, which was signed by Deere's then Chairman and Chief Executive Officer Hans Becherer, and by its President and Chief Operating Officer David Stowe, shared with employees basic concepts of the changes but noted the details were still being finalized.  Employees would select a medical plan from four choices through a flexible benefits program and pay for a portion of their own and their family's cost of medical coverage. (*Id.* at pp. 2-3.)  The letter further stated that "[t]hese benefits changes will be carried by active salaried employees into retirement." (*Id.* at p. 3.)

Effective July 1, 1993, current salaried employees and employees who retired after July 1, 1993 (referred to as "Flex Retirees") were required to pay cost-sharing premiums, some deductibles, and some co-pays for medical expenses, including vision, chiropractic, hearing and dental.  The basis for those changes was explained in the 1993 Summary Plan Description:

> the Company has been a leader in developing managed care medical plans, designed to control rising health care costs while still providing the level of care and coverage Deere employees expect to receive. John Deere Health Care was created based on these objectives.
> The John Deere Family Healthplan continues this tradition.  With its strong ties to the Mayo Clinic, our Family Health Centers also will help Deere control costs *and* provide personalized, state-of-the-art care.

> The last few years have been challenging times in the area of employee
> benefits, especially for health care.  And Deere, like most other U.S. firms, has
> needed to adjust.  That's why we've developed managed care medical options.
> Flexible benefits and health care cost sharing, both introduced in 1993, are two
> other steps we've taken to control rapidly rising medical costs, provide choices
> in benefits, and ensure quality.
>
> The need for change will always exist.  It's true for our business–our
> responses to changing business conditions over the last 150 years have kept
> our Company strong.  It's true for your benefits–our programs will change as
> conditions change.
>
> Deere's commitment is to provide you and your family a top-quality
> benefits program which is among the very best in American industry today.

(*Id.*)

Between 1993 and 2007, the cost sharing ratio between Deere and its employees and retirees changed modestly, more in a few years than in other years.  Also during this time, Deere initiated a series of special early retirement programs ("SERPs") to reduce its salaried workforce, and many salaried persons chose to retire and receive enhanced pension benefits offered in each such program.

## B.  Testimony of Named Plaintiffs and Other Class Members

The many retirees who testified share a common history of long-term and dedicated service to Deere in various salaried positions working at many Deere manufacturing, marketing and service locations.  Most served for many years before Deere introduced its flexible benefits program in July of 1993.  All the retirees who testified were satisfactory, valuable Deere employees during their careers.  Some of the individuals retired under the general terms of the Salaried Pension Plan; others retired under terms of the SERPs.

Dora Brubaker is a resident of Johnston, Iowa.  She worked for Deere from 1979 until October 2001, then retired under the terms of the 2001 SERP.

Thomas Blosch is a resident of Dubuque, Iowa.  He worked for Deere from 1972 until December 2001, then retired under the terms of the 2001 SERP.

Michael Stohlmeyer is a resident of East Moline, Illinois. He worked for Deere from 1960 until December 2001, then retired under the terms of the 2001 SERP.

Janet Harville is a resident of Ottumwa, Iowa.  She worked for Deere from  1973 until January 1999, then retired under the terms of the 1999 SERP.

Mark Mulvehill is a resident of Dubuque, Iowa.  He worked for Deere from 1972 until March 2000, then retired under the terms of the regular pension plan.

Diana Nielsen is a resident of Waterloo, Iowa.  She worked for Deere from 1968 until December 1998, then retired under the terms of the 1998 SERP.

Ronald Nichols is a resident of Des Moines, Iowa.  He worked for Deere from 1972 until December 1999, then retired under the terms of the 1999 SERP.

Judith Puls is a resident of Hazel Green, Wisconsin.  She worked for Deere from 1969 until December 2001, then retired under the terms of the 2001 SERP.

Their testimony was in lock-step.  All eight named class representatives testified about their memory of promises and comments supervisors made to them while employed at Deere regarding the pension and medical benefits they would receive in retirement.  They all testified in similar language about their individual ideas based on conversations with other Deere personnel, informing them that they would have lifetime medical benefits at the same level as when actively employed at Deere.  While most said they understood from 1993 on that Deere could make minor changes in medical benefits and plans, such as requiring cost-sharing for medical premiums, adding deductibles,  and including co-payments, the retirees

believed other aspects of their medical benefits and the basic medical care program would remain the same throughout retirement.  The retirees all testified that if they had known Deere had the right to and would eventually make such major changes as occurred in January 2008, they would have made different work-life decisions, such as seeking different employment, preparing financially for a future of increased medical costs, or delaying their retirement.

Many other retirees, who are not class representatives, offered similar testimony during the trial, including William Pendergast, Ronald Weydert, David Mackenzie, Dale Allen, Steven Hill, Larry Pritchard, Dwight  Soper, Patrick Cady, Bonnie Adams, Virginia Thorsen, Darla Litton, Darryl Matthews, Dave Wieland, James Ohrt, Carlos Salaber, Thomas Thorsen, Eleanor Hilbert, Donald Grass, Nancy Woodhouse, David Hungate, Roger Kessler, Patricia Van Bruwaene, Marilyn McLemore-Demers, Robert Papenhausen, and Ronald Peterson.  Plaintiffs presented, not in evidence but as a demonstrative chart for oral argument, a helpful chart showing where the witnesses worked and with whom, identifying pages in the trial transcript that reference their testimony.  Most of these witnesses were supervisors for a time or in middle management positions.  A significant portion of these retirees' testimony concerned their memory of conversations they recalled having with Deere supervisors and managers from time to time in which they discussed the importance of medical benefit plans and pension plans.  Of course the flexible benefits program was not introduced until July 1993, so the witnesses had a greater stake in benefit changes and were better able to recall details of conversations beginning in that year.  But the court has found the testimony about oral conversations quite vague and not persuasive in contrast with the written plan provisions

and SPDs that explained benefits and their limits.

## C. Reservation of Rights by Deere

The evidence presented by Deere, primarily through plan documents, written communications, and cross-examination of the plaintiffs' many witnesses, focused on establishing Deere's position that it had an unqualified right to amend, modify or terminate the plans at issue. Deere set forth regularly the standard reservation-of-rights language in its Salaried Pension Plan, Salaried Health Plan and periodic revised Summary Plan Descriptions. Since July 1, 1993, the following reservation-of-rights clauses, or similar wording, has been repeated in Deere's Salaried Health Plan:

> The Company reserves the right to amend, modify, suspend, or terminate the Plan, in whole or in part, at any time and for any reason. By way of illustration (but not limitation), the Company reserves the right –
>
> (a)    to require some or all of the covered Employees, Retirees, Surviving Spouses, and other Participants to pay a larger share of the cost (or the full cost) of coverage under the Plan as the Company or an Employer may, in its discretion, decide; and
>
> (b)    to amend, modify, suspend or terminate benefits under this Plan, regardless of whether a claim for benefits has already been incurred or benefits are otherwise in pay status.
>
> However, in no event shall the Company violate ERISA section 510. Participants do not become entitled to vested benefits or vested rights under this Plan.

(John Deere Health Benefit Plan for Salaried Employees (Amended and Restated Effective July 1, 1993) (Ex. 3018) § 19.1; John Deere Health Benefit Plan for Salaried Employees (Amended November 5, 1997; Effective January 1, 1998) (Ex. 3019) § 19.1; John Deere Health Benefit Plan for Salaried Employees (Amended January 12, 2000; Effective January

1, 2000) (Ex. 3020) § 19.1.)

In the Salaried Health Plan effective January 1, 2007, the same reservation-of-rights

language was included, with the exception that the last paragraph stated as follows:

> However, in no event shall an amendment, modification, suspension, or termination of the Plan affect the ability of a Participant to be reimbursed for Allowed Charges incurred for Medical Care provided to the Participant prior to the date of the amendment, modification, suspension, or termination. Participants do not become entitled to vested benefits or vested rights under this Plan.

(John Deere Health Benefit Plan for Salaried Employees (Amended and Restated Effective

January 1, 2007) (Ex. 3021) § 19.1.)

Summary Plan Descriptions ("SPDs") have also contained reservation-of-rights

language.  The SPDs provide highlights and summaries of Deere's benefit plans and

personnel policies. (*See* 1993 SPD (Ex. 3005).)  As described to the employees in the 1993

SPD:

> It is your summary plan description and not the official Plan Document for the ERISA plans . . . .  Complete details of the plans are contained in the official Plan Documents.  If any information described in this book is different from the Plan Documents, the language in the official Plan Documents governs. . . . Your Personnel/Human Resources Department can help you through these procedures if you have questions. . . . Deere & Company may amend, modify, suspend, or terminate the terms of any of the plans described in this book.

*Id.*  The employees were further informed:

> Your Salaried Employee Benefits book is designed to be easy to use, whether you read it cover to cover or you simply use it as a reference when you have specific questions.

*Id.*  Under a section entitled "Medical Benefits in Retirement", employees were informed that

> [w]hen you retire from the Company, you may continue to receive medical coverage under a Deere-sponsored medical option.  The options available to

16

you are the same as the medical options offered to active employees in your area.

\* \* \*

Your medical benefits in retirement are the same as the benefits provided for active employees enrolled in the same medical option. Medical options and coverages may change from time to time. You will be notified of changes during the annual enrollment period.

*Id.*

Since 1993, the Summary Plan Descriptions have included the following reservation

of rights:

Deere & Company reserves the right to suspend or terminate the Plan; to modify the Plan to provide different cost sharing between the Company and participants; or to amend the Plan in any respect. Changes may occur at any time.

(1993 SPD (Ex. 3005); 1995 SPD (Ex. 3006); 1996 SPD (Ex. 3007); 1998 SPD (Ex. 3008);

1999 SPD (Ex. 3009); 2001 SPD (Ex. 3010); 2004 SPD (Ex. 3011); 2005 SPD (Ex. 3012);

2006 SPD (Ex. 3013); 2007 SPD (Ex. 3014).)  This language was repeated under sections

entitled: "If a Plan is Amended, Modified, Suspended, or Terminated." *Id.*   SPDs also

contained the following language:

All statements in this book, the official Plan Documents, and all representations by the Company or its personnel are subject to this right of amendment, modification, suspension, or termination. These rights apply without limitation, even after an individual's circumstances have changed by retirement or otherwise.

Plan benefits do not become vested except as provided under the Pension Plan and the Savings and Investment Plan, and then only to the extent specifically provided in the Plan documents for the Pension Plan and Savings and Investment Plan.

(*Id.*)

Deere's proclaimed right to amend, modify or terminate the plans was also reiterated

in other documents which were either provided or available to the employees.  For example,

reservation-of-rights language was included in a document referred to as Total Compensation

Summary, which was specifically prepared for individual employees and designed to give

them information about the total value of their direct and indirect compensation.  (*See* Total

Compensation Summary Prepared April 1994 for Michael Stohlmeyer (Ex. 2018).)  The

Total Compensation Summary read in part:

> The Company's plans are provided for the exclusive benefit of its employees,
> retirees and their dependents.  The Company reserves the right to amend,
> modify, suspend or terminate these plans at any time.
>     By their very nature, compensation and benefit plans tend to be ongoing
> and evolutionary.  The Company's goal for its compensation and benefit plans
> is to best serve the needs of employees and meet its obligations to remain
> competitive and profitable in global markets.

*Id.*

In annual confirmation/enrollment forms provided to employees, the following

language, in relatively small type, was contained above the employee signature line:

> Finally, I understand that the terms and conditions of the Flexible Benefit Plan
> are subject to, and controlled by the various Plan documents that compromise
> the Plan, which are subject to amendment, change, modification or termination
> by the Company at any time.

(John Deere Flexible Benefits Confirmation/Enrollment Form (Ex. 3055); John Deere

Benefit Enrollment Form (Ex. 2010).)  This particular document is of less importance

because employees were not required to sign and return the form if they chose to make no

changes in their individual program.  Several witnesses testified they were unaware of the

reservation-of-rights language contained in these annual confirmation/enrollment forms.

Finally, reservation-of-rights language was also included in slideshow presentations

given to salaried employees considering the special early retirement programs offered by Deere.  For example, a slide presented during presentations for the July 2001 SERP stated at the bottom: "The Company has the right to amend, modify, or terminate benefit plans at any time." (*See* Exs. 2039, 2040.)  As with the annual enrollment forms, the court finds this evidence also carries relatively little weight in light of repeated testimony of retirees they either did not attend the presentation or notice the language on the screen.

Deere officers testified credibly that they knew of the existence of the reservation-of-rights language, relied on it in considering plan changes, and believed Deere always had reserved the right to amend, modify or terminate medical benefits.  The court finds credible that testimony of Glenn Huston (Director of Human Resources Global Development), Duane Olson (Manager of Benefits, Planning, and Compliance), Mertroe Hornbuckle (Vice President of Human Resources), Carol Lewis (Manager of Employee Benefits), and Steven Clark (Deere's former Manager of Benefits Planning and Strategic Design).  Also, in rebuttal, several Deere mid-level managers and former managers denied telling employees they had fixed lifetime medical benefits that could not be changed; they testified they knew Deere had the right to change medical benefits and would not have told anyone the contrary.

**D.  Healthy Directions Program Introduced to Flex Retirees**

In October 2005, Mertroe Hornbuckle sent a cover letter to Flex retirees with the packet containing annual enrollment materials for 2006 which announced the introduction of a new health plan program entitled "Healthy Directions." (Hornbuckle October 2005 Letter to Flex Retirees (Ex. 2013).)  Under the heading "*Healthy Directions:* A New Approach to Health Care Benefits," the letter stated:

For active, salaried employees, we are introducing a new health plan program called *Healthy Directions*.  It is a new approach to health care benefits.  The *Healthy Directions* program is a two-pronged approach to health care, providing employees greater control and choice over:

1) How they manage their health
2) How they choose to spend - and save - health care dollars

The *Healthy Directions* program provides the same overall benefit value as today.  In addition, it allows employees and the company to take advantage of new tax code changes.  What's different is how and when employees pay for health care services.

New health care benefit plans, which are part of the *Healthy Directions* program, will roll out in 2007 for active, salaried employees.

**Impact to You and Next Steps**
In the past, your health care benefit plans have mirrored the plans for active, salaried employees.  However, the health plan changes being implemented with active salaried employees in 2007 will not include Flex retirees.  Instead, we expect to introduce the same or similar *Healthy Directions* program for Flex retirees at a later date, sometime after January 2007.

Once specifics are determined, we will help you prepare for these changes through additional communication and education regarding *Healthy Directions*.

We are committed to providing competitive, quality health care benefits while addressing the impact of rising health care cost on the company's long-term financial stability.  We believe this new approach to health care benefits will be good for retirees, employees, and the company.  We will continue to update you with more details in the coming months.

(*Id.* at pp.1-2.)  At the bottom of the letter on the second page, the following reservation-of-

rights language appears:

Deere & Company reserves the right to suspend or terminate the Plan(s); to modify the Plan(s) to provide different cost-sharing between the company and participants; and to amend the Plan(s) in any respect.  Changes may occur at any time.  Changes are made by action of the company's board of directors, or to the extent authorized by resolution of its board of directors, or by the Deere & Company Compensation Committee.

(*Id.* at p. 2.)

In October 2006, Hornbuckle sent another cover letter with the 2007 health care enrollment materials which further discussed the Healthy Directions program:

> ### *Healthy Directions* **and Retiree Health Care for 2008**
> Your health care benefit plans have mirrored the plans for active salaried employees. This year, we introduced a new health plan program, called *Healthy Directions*, for active employees with salaried health care benefits. *Healthy Directions* provides the same overall benefit value as in the past. What's different is how and when employees pay for health care services.
>
> In the summer/fall 2007 timeframe, the *Healthy Directions* retirement approach will be communicated to Flex retirees and active employees who have company subsidized retiree health care benefits. As we have communicated in the past, the *Healthy Directions* retirement approach for Flex retirees will take effect 1 January 2008.

(Hornbuckle October 2006 Letter to Flex Retirees (Ex. 2086) at pp. 1-2.) This letter also contained the same reservation-of-rights language as the October 2005 letter. (*Id.* at p. 2.)

Then in September 2007, an announcement letter from Hornbuckle and information packets were sent to Flex retirees regarding the new Healthy Directions program, to become effective January 1, 2008. (*See* Ex. 2097; Ex. 2098.) The packets included a DVD and detailed explanation of the new benefit changes. (*See* Ex. 2097.) The retirees were also informed of meetings to be held during the early part of October, in several locations, "to briefly review the plans, demonstrate the Medicare Advantage and Prescription Drug plan enrollment process, and answer general questions." (*Id.*) Those materials explained that the Healthy Directions program combined a Health Savings Account with new health care plans for those retirees who were not eligible for Medicare. (*Id.*) For retirees eligible for Medicare, the program combined the provision of Retiree Medical Credits with Medicare Advantage

21

Plan. (*Id.*)  The Medicare employees were to choose their own medical, prescription drug, dental, and vision coverage based on their individual needs. (*Id.*)  Retirees not eligible for Medicare were instructed to choose between the two new coverage plans, or no coverage, between October 29 and November 9, 2007. (*Id.* "Healthy Directions for early retirees" Book, September 2007, at p. 3.)  Enrollment for Medicare retirees included a reservation or pre-enrollment period from October 1 to November 15, 2007, to select and reserve Medicare Advantage, and then a final period from November 15 to December 1, 2007, to finalize their enrollment. (*Id.* "Healthy Directions for Medicare retirees" Book, September 2007, at pp. 2, 13.)

Several retirees testified they were confused regarding the various changes made by the Healthy Directions program, the available options to them under the program, and the process for enrollment.  The retirees also felt they were provided insufficient notice and time to evaluate the information and options available, and make the necessary decisions prior to the enrollment periods.

Hornbuckle responded to some of those concerns in letters to Flex retirees dated October 26, 2007 (Ex. 2099) and October 29, 2007 (Ex. 2100).  In a subsequent letter, dated November 7, 2007, Hornbuckle verified that Deere extended the enrollment periods, with a posting on the John Deere Retiree Web site. (Ex. 2102.)  The enrollment for non-Medicare retirees was extended to November 21, 2007, and for Medicare-eligible retirees the period was extended to December 14, 2007. (*Id.*)  Hornbuckle explained that those extensions of time were made "in response to feedback we have received regarding the complexity and the time needed to make your enrollment decisions." (*Id.*)  In a letter dated November 14, 2007

(Ex. 2103), Hornbuckle informed retirees that "the entire company contribution of Retiree Medical Credits ($2,850 for a retiree and $2,280 for a spouse) or Health Savings Account funds ($700 for an individual, or $1,300 for a couple or family) will be made in January instead of over the course of the year, as was initially planned." Throughout this time period, resources were available to assist retirees in making their enrollment decisions including telephone help lines, a retiree web site, and for Medicare retirees the company AFI Benefits. (*See id.*)

Plaintiffs' primary focus in all four counts of their complaint is this Healthy Directions program introduced January 1, 2008, which plaintiffs contend violated ERISA and common law principles. Contrary to the statements made by Hornbuckle that Healthy Directions provides the same overall benefit value as in the past, plaintiffs believe the changes reduced their health benefits significantly. To support their claim, plaintiffs presented in rebuttal their expert witness, Christopher Bean, to testify that the Healthy Directions plan constituted a major change and reduction in medical plan benefits for retirees. Bean opined that the changes implemented by Deere effective January 1, 2008, constitute an overall reduction in medical benefits for retirees. The court denied Deere's motion to exclude the testimony of Bean as unreliable and considered it not to prove damages but to understand the extent of the change in overall plan benefits. The court concludes, however, that Bean's testimony and his opinions were not very persuasive and in several respects actually supported Deere's position that Healthy Benefits was an improved medical benefits plan for the entire class of retirees. Bean testified "the changes that were put into place in 2008 for the John Deere flex retiree group represented a reduction in benefits for a portion of the retirees population."

(Trial Tr. at 2049.)  After explaining the basis for his opinion in some detail, Bean conceded

that he did not have or look at internal Deere data for 2006 or 2007 regarding the costs that

its retirees were incurring. (*Id.* at 2081, 2090.)  He further conceded that not all retirees

would necessarily experience a benefit reduction in 2008:

> Q. And you testified with respect to the pre 65 group that some retirees would experience a benefit reduction in 2008 versus what they had in 2007?
>
> A. Correct.
>
> Q. And, of course, many others would not, is that correct?
>
> A. That's true. I didn't have the data to know how many, but yes, the people who were not the heavy users of the plan would likely benefit from that.
>
> Q. Well, it's inherent in the nature of any plan that some people do better than others, isn't it?
>
> A. It is, but the change from 2008 to 2007 made that difference a little bit more extreme and shifted more of the burden to the heavier users of health care.
>
> Q. You're saying in theory because you don't have the data?
>
> A. In theory, correct, in theory.
>
> Q. Because you didn't have the data to compare the actual effect, correct?
>
> A. Correct. I was not provided that data to compare.

(*Id.* at 2087.)  Bean's testimony was too vague and indefinite to prove the Healthy Benefits

program actually reduced benefits overall.  While some of the class members certainly

experienced a reduction in dollar value of medical benefits they received compared to pre-

2008 programs, the court is left in the dark about whether the approximately 5,000 class

members who have an interest in the outcome of this litigation would overall be worse off

or better off under Healthy Directions, as contended by the Deere defendants.

## IV.  CONCLUSIONS OF LAW

Congress enacted ERISA to protect "the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b).

The United States Supreme Court has written that the central object of ERISA is "protecting employees' justified expectations of receiving the benefits their employers promise them." *Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 743, 124 S.Ct. 2230, 159 L.Ed.2d 46 (2004)**.**  Nothing in ERISA, however, requires employers to establish employee benefits plans or mandates "what kind of benefits employers must provide if they choose to have such a plan.' *Id.* (quoted citations omitted).  On the other hand, "'ERISA does . . . seek to ensure that employees will not be left nearly empty-handed once employers have guaranteed them certain benefits.'" *Id.*

From the testimony presented at trial, it is abundantly clear that at least some of the Deere retirees believe they have been left empty-handed after the changes made by Deere in January 2008.  The question which must be answered by this court is whether those employees' expectations were justified and whether Deere guaranteed them the benefits they seek to have restored.  This court's analysis is guided in part by pertinent language in an ERISA decision of the United States Court of Appeals for the Seventh Circuit:

ERISA requires firms to establish their plans in writing, to provide participants

> with written summary plan descriptions, and to furnish the full text of the plans on request. All of these provisions suppose that the written terms are the effective terms. Havoc would ensue if plans meant different things for different participants, depending on what someone said to them years earlier. Memory is weak compared to the written word, and there is a substantial risk that participants will not correctly recall what was said, will exaggerate (in their favor) what they heard, or will simply prevaricate in order to improve their position. Employers could do little to protect themselves against such claims-which is why ERISA calls for writings, and why we concluded above that a rule akin to the statute of frauds applies to all claims based on bilateral contracts. If it is hard now to administer plans that apply to all participants, it is impossible to see how any employer could administer a plan that meant something different for each participant, where the difference was not committed to writing. What is more (and perhaps worse), binding the plan's sponsor to the oral advice of its benefits staff might lead the employer to discontinue giving advice, telling participants to read the documents and draw their own conclusions. That step would protect employers, but it very likely would increase the level of misunderstanding among participants.

*Frahm v. Equitable Life Assurance Soc'y*, 137 F.3d 955, 960 (7th Cir. 1998)(denying non-class action ERISA claims).

After carefully weighing the evidence under the applicable legal standards, the court finds Deere did not guarantee their retirees would have medical benefits throughout their life with no change, or with changes limited to cost-sharing components such as co-pay, deductibles and premiums. Instead, Deere repeatedly and plainly stated in plan documents, including SPDs, that it retained the right to amend, modify or terminate the benefit plans. Plaintiffs' expectations to the contrary, based on flawed memories of what supervisory personnel had told them at various times, were not justified or reasonable. They have not proved any of their four causes of action against the Deere defendants.

## A.  Violations of ERISA and the Terms of the Plans

Under Count I, plaintiffs claim the plan documents, together with the extrinsic

evidence presented at trial, establish that the class members had vested rights to retiree medical benefits.  Although intertwined, the claim divides into the two categories defined by the subclasses: (1) employees who were vested under the terms of the Salaried Pension Plan and were eligible to retire as of July 1, 1993, and (2) employees who later retired under one of several SERPs.  Plaintiffs contend these groups had vested, enforceable rights to medical benefits throughout their retirement on the same basis as during their active employment.

"A 'vested right' is commonly defined as a 'right that so completely and definitely belongs to a person that it cannot be impaired or taken away without the person's consent.'" *Halbach v. Great-West Life & Annuity Ins. Co.*, 561 F.3d 872, 877 (8th Cir. 2009)(quoting *Black's Law Dictionary* 1349 (8th ed. 2004).)  ERISA categorizes employment benefits as either pension benefits or welfare benefits. *Id.* (citing 29 U.S.C. § 1002(1)-(2)).  Here, the dispute centers on medical benefits which fall under the category of welfare benefits.

This distinction is critical because "[w]hile ERISA mandates vested pension benefits, Congress did not mandate vesting for employee welfare benefit plans." *Id.* (citing 29 U.S.C. §§ 1051(1), 1053; *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995)).  Consequently, an employer such as Deere "'may unilaterally modify or terminate medical benefits at any time absent the employer's contractual agreement to the contrary.'" *Id.* (quoting *Jensen v. SIPCO, Inc.*, 38 F.3d 945, 949 (8th Cir. 1994)(quotation omitted)).  It is possible, however, for medical benefits to vest "if a promise to provide vested benefits is incorporated in some fashion into the formal written ERISA plan." *Id.* (citing *Hughes v. 3M Retiree Med. Plan*, 281 F.3d 786, 790 (8th Cir. 2002)).  Under such circumstances, whether medical benefits are vested becomes a matter of private contract

law, and the court's inquiry begins with examining the written plan documents. *Id.*

In reviewing the plan documents, the court gives "'the language its common and ordinary meaning as a reasonable person in the position of the [plan] participant, not the actual participant, would have understood the words to mean.'" *Id.* (quoting *Hughes*, 281 F.3d at 790 (quoting *Chiles v. Ceridian* Corp., 95 F.3d 1505, 1511 (10th Cir.1996)); *Barker v. Ceridian Corp.*, 122 F.3d 628, 632 (8th Cir.1997)(*Barker I*)).  Whether other evidence outside the language of the plan documents is admissible, and should be considered by the court to determine the meaning and effect of the language, "turns on the relative ambiguity of the plan provision being construed." *Id.*

This court has carefully examined the specific reservation-of-rights ("ROR") provisions in the Deere plan documents, within the context of all plan documents as a whole, to determine the intent and purposes for those provisions.  The Salaried Health Plan at issue here is an employee welfare benefit plan within the meaning of ERISA, 29 U.S.C. § 1002(1).  The controlling plan documents in this case are the Salaried Health Plan, Salaried Pension Plan and SPDs in effect after July 1, 1993.  Upon a plain reading of their language, those controlling plan documents explicitly and unambiguously reserve to Deere the right to terminate, modify or amend the plans.

The Court of Appeals for the Eighth Circuit has "repeatedly held that an unambiguous reservation-of-rights provision is sufficient without more to defeat a claim that retirement welfare plan benefits are vested." *Stearns v. NCR Corp.*, 297 F.3d 706, 712 (8th Cir. 2002)(citing *Hughes v. 3M Retiree Medical Plan*, 281 F.3d 786, 792-93 (8th Cir. 2002)(reservation of rights provision in plan "devoid of vesting language" defeats vesting

claim); *United Paperworkers Int'l Union v. Jefferson Smurfit Corp.*, 961 F.2d 1384, 1385 (8th Cir.1992)(unambiguous reservation of rights clause and "absolutely nothing in the plan to contradict or cloud [its] plain and obvious meaning" defeats vesting claim); *Anderson v. Alpha Portland Indus., Inc.*, 836 F.2d 1512, 1514, 1519 (8th Cir.1988) (plan provision that retirement health benefits "may now or hereinafter be amended, modified or supplemented in collective bargaining" inconsistent with vesting), *cert. denied*, 489 U.S. 1051, 109 S.Ct 1310, 103 L.Ed.2d 579 (1989)).  This court is bound to apply that principle of law repeatedly emphasized in these court of appeal decisions.

> If a reservation-of-rights provision is facially ambiguous, or if it conflicts with other plan provisions, the court in resolving a dispute over vesting may look at extrinsic evidence to determine whether the parties intended to confer vested retirement health care benefits.  *See Barker v. Ceridian Corp.*, 122 F.3d 628, 635-39 (8th Cir.1997); *Jensen*, 38 F.3d at 950-52.  But there must be an affirmative indication of vesting in the plan documents to overcome an unambiguous reservation of rights.

*Stearns*, 297 F.3d at 712.  Contrary to plaintiffs' argument the court finds no ambiguity exists whether the reservation-of-rights provisions in this case are read independently, or with the relevant plan documents as a whole, or in the light of the extrinsic evidence on which plaintiffs rely.  So plaintiffs proved no contractual vested right to retiree medical benefits as of July 1, 1993, or thereafter.

Plaintiffs contend their annual benefits statement contained statements that during retirement, retirees "will continue to be covered for: All Health, Surgical and Prescription coverage you had as an employee except doctor's office or home call charges."  Plaintiffs also emphasize this language from the SPDs: "When you retire from the Company, you may continue to receive medical coverage under a Deere-sponsored medical option."  But the

language that medical benefit coverage "continues" in retirement is not synonymous with being "vested."  Where language stating that retiree medical benefits "will continue" is accompanied by a reservation-of-rights provision, the plan sponsor retains the unqualified right to change the plans as a matter of law.  As noted by the Eighth Circuit Court of Appeals, "a reservation-of-rights provision is inconsistent with, and in most cases would defeat, a claim of vested benefits." *Jensen*, 38 F.3d at 950.

Even though there is no need to resort to extrinsic evidence, the court agrees with Deere that the greater weight of that evidence supports Deere's right to change the plans. Granted the named plaintiffs and some other class members personally believed and truly have hoped that Deere had only the right to modify or adjust a few features of the plans, such as increasing deductibles and injecting co-pays on coverage.  Few testified that Deere could not require health care cost sharing between participants and Deere.  While several of the plaintiffs testified they did not notice, read, or try to understand the reservation-of-rights language in the plan documents, some who noticed the language believe it applied prospectively and only to current employees, not to those already retired.  At a basic level, this testimony confirms that Deere had the right to make, and in fact did make changes to the medical plans over the years leading up to January 1, 2008.  Some of the retirees who testified explained they thought any medical plan change could only apply prospectively to active employees and could only apply to "minor" cost sharing components such as premiums, deductibles and co-pays.  The plan documents cannot reasonably be read in that fashion.

Plaintiffs also argue that the SERPs constitute binding and enforceable ERISA plans

that vest benefits.  Plaintiffs point to the following language that was included in SERP

materials:

> You will continue to be eligible for health benefits in retirement on the same
> basis as during active employment.  Premiums will be deducted from your
> monthly pension payment on an after tax basis.

(2001 SERP (Ex. 2022).)  Some retirees testified that similar oral representations were made

at meetings held for SERP eligible employees.  Some retirees may well have believed that

SERP language and representations made during those meetings, standing alone, would

entitle them to receive the same health benefits throughout their retirement, in exchange for

their electing the SERP.

> As defined by ERISA, an employee welfare benefit plan or welfare plan includes:

> any plan, fund or program . . . established or maintained by an employer . . .
> for the purpose of providing for its participants or their beneficiaries, through
> the purchase of insurance or otherwise, (A) medical, surgical or hospital care
> or benefits . . . [or other benefits.]

29 U.S.C. §1002 (1).  An "employee pension benefit plan" and "pension plan" includes:

> any plan, fund, or program . . . established or maintained by an employer . . .
> to the extent that by its express terms or as a result of surrounding
> circumstances such plan, fund, or program -

> (I) provides retirement income to employees . . .

> regardless of the method of calculating the contributions made to the plan, the
> method of calculating the benefits under the plan or the method of distributing
> benefits from the plan.

29 U.S.C. §1002 (2)(A).

> The Court of Appeals for the Eighth Circuit has written, "[a] plan is established for

ERISA purposes when a reasonable person can ascertain (1) the intended benefits, (2) the

class of beneficiaries, (3) a source of funding, and (4) the procedures for receiving benefits."
*Petersen v. E.F. Johnson Co.*, 366 F.3d 676, 678 (8th Cir. 2004)(citing *Bannister v. Sorenson*, 103 F.3d 632, 636 (8th Cir. 1996)). Plaintiffs simply were unable to prove that all these elements were present in this case. The SERPs are not binding and enforceable ERISA plans or even bilateral ERISA contracts, as urged by plaintiffs. *See Stearns*, 297 F.3d at 712; *Jensen*, 38 F.3d at 950.

The Salaried Pension Plan explicitly provides that eligibility for retiree health benefits must be determined under the provisions of the "Medical Plan." The term "Medical Plan" is defined as follows in the Salaried Pension Plan:

> Heritage National Healthplan (an HMO), the John Deere Health Benefit Plan for Salaried Employees, and such other plans under which the Company provides Medical Benefits in the form of some or all of the premiums or other costs on behalf of Eligible Retirees and Eligible Spouses.

(Salaried Pension Plan (Exs. 3028-3031).) The SERPs do not constitute stand-alone medical plans. Instead, as acknowledged by several witnesses including plaintiffs' class-member witness Van Bruwaene, SERPs are merely amendments to the Salaried Pension Plan and specifically incorporated into the Salaried Pension Plan.

The Salaried Pension Plan provisions that comprise the SERPs are contained in Article III, Sections 3 and 3.1 and the exhibits attached thereto. SERPs are implemented only by the Deere Compensation Committee through exhibits attached to the Salaried Pension Plan from time to time. The Salaried Pension Plan states, *inter alia*, that

> Early Retirement under this [section] shall be available to all qualifying employees at the location or locations specified, and during such time periods as are specified, in Exhibits to the Plan. Such Exhibits may be adopted from time to time, and will be attached to, and form a part of, the Plan. The

> provisions of any such Exhibits shall be given the same effect that such
> provisions would have if they were incorporated within the basic text of the
> Plan.  Except as expressly provided to the contrary, the terms used in such
> Exhibits shall have the same meaning as those terms have for all other
> purposes under the Plan, and all provisions of the Plan not inconsistent with
> such Exhibits will continue to apply to the persons affected by such Exhibits.

(*Id.*)  Moreover, the SERPs do not provide medical benefits or say anything about medical

benefits as defined by the plan documents.  The Salaried Pension Plan defines "Medical

Benefits" as:

> the payments of premiums or other costs of coverage under a Medical Plan on
> behalf of an Eligible Retiree and/or an Eligible Spouse in accordance with the
> terms of this Plan.  Medical Benefits will only constitute those benefits that are
> set forth in Section 213(d) of the Code.

(*Id.*)  The SERP provisions contained in the Salaried Pension Plan merely outline the service

credits needed for an employee to retire early and obtain enhanced pension payments under

the plan.  The SERP provisions do not provide enhanced or fixed health care benefits.

Moreover, nothing in the correspondence surrounding the initiation of SERPs

indicates that Deere intended to nullify the reservation-of-rights provisions contained in the

Salaried Health Plan or Salaried Pension Plan.  To the contrary, the evidence establishes that

employees considering SERPs were given notice in writing in plan documents that Deere

reserves the right to terminate, modify, or suspend the plans.

The court also agrees with Deere that the correspondence surrounding the SERPs did

not promise plaintiffs vested medical benefits.  Nothing in that correspondence was

sufficiently definite to qualify as a stand-alone "Medical Plan," nor does the correspondence

that accompanied the mandatory release and settlement agreement forms create independent

bilateral contracts regarding retiree medical benefits.  An intent to vest medical benefits

cannot reasonably be implied from the fact that the settlement agreements and correspondence surrounding the SERPs were silent as to vesting and did not cross-reference the Salaried Health Plan's reservation-of-rights provisions.

The court concludes plaintiffs have failed to establish their claims under Count I of the First Amended Class Action Complaint; judgment shall be entered in favor of Deere on that ERISA cause of action.

## B. Breach of Fiduciary Duty

Plaintiffs contend Deere should be held liable "'in its fiduciary capacity for making affirmative misrepresentations on breach of fiduciary duty and equitable estoppel theories.'" *Antolik v. Saks Inc.*, 383 F.Supp.2d 1168, 1178 (S.D. Iowa 2005)(quoted citations omitted). Because Count II (breach of fiduciary duty) and Count III (estoppel) have not been certified as class action, the court's consideration of those claims is limited to plaintiffs Dora Brubaker, Thomas Blosch, and Michael Stohlmeyer.

The Court of Appeals for the Eighth Circuit has written,

> [a]n ERISA fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), and must comply with the common-law duty of loyalty, including the "obligation to deal fairly and honestly with all plan members." *Shea v. Esensten*, 107 F.3d 625, 628 (8th Cir. 1997)(citing *Varity Corp. v. Howe*, 516 U.S. 489, 506, 116 S.Ct. 1065, 134 L.Ed. 2d 130 (1996)), *cert. denied*, 522 U.S. 914, 118 S.Ct. 297, 139 L.Ed.2d 229 (1997).

*Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 644 (8th Cir. 2007). Accordingly, a fiduciary such as Deere "may not affirmatively miscommunicate or mislead plan participants about material matters regarding their ERISA plan." *Id.* (internal quotation marks omitted).

A statement is materially misleading if there is "a substantial likelihood that it would mislead a reasonable employee in the process of making an adequately informed decision regarding . . . benefits to which she might be entitled." *Krohn v. Huron Mem'l Hosp.*, 173 F.3d 542, 551 (6th Cir. 1999). Additionally, a fiduciary has a duty to inform when it knows that silence may be harmful, *Shea*, 107 F.3d at 629 (quotations and citations omitted), and cannot remain silent if it knows or should know that the beneficiary is laboring under a material misunderstanding of plan benefits, *Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 381 (4th Cir. 2001). The duty of loyalty requires a fiduciary to disclose any material information that could adversely affect a participant's interests. *Shea*, 107 F.3d at 628; *see Eddy v. Colonial Life Ins. Co. of Am.*, 919 F.2d 747, 750 (D.C. Cir. 1990) ("The duty to disclose material information is the core of a fiduciary's responsibility. . . .").

*Id.*

To establish their breach of fiduciary claims under ERISA, plaintiffs must show (1) Deere was acting in a fiduciary capacity, (2) misrepresentation on the part of Deere, (3) the materiality of that misrepresentation, and (4) detrimental reliance by plaintiffs on the misrepresentation. *Antolik*, 383 F.Supp.2d at 1178; *Martino-Catt v. E.I. duPont Nemours & Co.*, 317 F. Supp. 2d 914, 927 (S.D. Iowa 2004).

The court finds plaintiffs did not prove that Deere concealed any upcoming plan changes or made any material misrepresentations on which plaintiffs could reasonably rely to their detriment. Granted some retirees apparently misunderstood or failed to realize that Deere explicitly reserved in its plan documents the right to amend or modify their medical benefits. Misunderstanding by the retiree alone, however, does not equate to misrepresentation by the employer under the law. Any reasonable reading of the plan documents plainly alerted salaried employees that Deere could lawfully modify or even terminate medical benefits. Deere managers made reasonable efforts to distribute to all employees and all retirees, in written SPDs, other letters, and after 2000 by cd's and internet

communication, the terms of the benefit program and the ROR language allowing changes in benefits. The court finds plaintiffs did not prove any or all of the managers in bad faith delayed or concealed their intention to make plan changes and describe the changes once management had finalized and approved the changes.

Deere is entitled to judgment in its favor on plaintiffs' claims alleging breach of fiduciary duty, pleaded in Count II of the First Amended Class Action Complaint.

## C. Equitable and Promissory Estoppel

Plaintiffs Brubaker, Blosch, and Stohlmeyer's Count III claims of equitable estoppel and promissory estoppel are quite similar to their claims of breach of fiduciary duty. To succeed on an equitable estoppel claim, plaintiffs must show: "1) a material representation; 2) reasonable and detrimental reliance upon the representation; and 3) extraordinary circumstances." *Antolik*, 383 F.Supp.2d at 1178; *see also Neely v. American Family Mut. Ins. Co.*, 123 F.3d 1127, 1129-30 (8th Cir. 1997)(under doctrine of equitable estoppel, plaintiff must establish clear and convincing evidence of false representation or concealment of material terms, lack of knowledge by plaintiff, intention by defendant that the representation or concealment be acted on, and reliance by plaintiff to its prejudice); *Jensen*, 38 F.3d at 953 ("courts recognizing estoppel in ERISA cases require proof of a material misrepresentation on which the participant or beneficiary has reasonably relied to his detriment").

The three plaintiffs asserting estoppel claims testified they remembered, though somewhat vaguely as to time and place, that their supervisors promised they would be entitled to lifetime health benefits and Deere should be estopped from providing those lifetime health benefits. In their minds, Deere managers treated salaried employees as "family," and decades

of repeated company-wide assurances of lifetime health benefits, even made with offers of early retirement, should be deemed extraordinary circumstances that render Deere liable under the Count III theory of equitable or promissory estoppel. Many plaintiffs testified they reasonably relied to their detriment on the alleged misrepresentations made by Deere regarding the continuation of retiree health benefits for the "family" of Deere workers.

Deere responds that the plaintiffs fail to support any estoppel claim because the plans' ROR language is unambiguous. Deere argues plaintiffs' reliance on any contrary representations was unreasonable. The court agrees.

Plaintiffs have not proved by clear and convincing evidence, nor by the greater weight of all the evidence, that Deere managers were authorized to make and did make false representations or promises regarding retiree medical benefits. Deere did not conceal any material facts or ideas regarding retiree medical benefits. The plan documents clearly and unambiguously gave Deere the right to amend or modify the terms of the plans. To the extent plaintiffs relied on statements to the contrary, their reliance was unreasonable and unjustified. The evidence presented at trial falls far short of proving either misrepresentation by Deere, or reasonable and detrimental reliance by plaintiffs, or extraordinary circumstances that might support the equitable estoppel claims.

Consequently, plaintiffs are not entitled to relief based on their claims of equitable or promissory estoppel. Judgment shall be entered in favor of Deere on Count III of the First Amended Class Action Complaint.

## D. Violations of ERISA Disclosure Requirements, Claims Procedure Requirements and Applicable Regulations

Plaintiffs in Count IV of their complaint allege Deere violated ERISA's disclosure and claims procedure  requirements under 29 U.S.C. §§ 1022 and 1024, and applicable ERISA regulations.  Section 1024(b)(1) provides in relevant part as follows:

> Publication of the summary plan descriptions and annual reports shall be made to participants and beneficiaries of the particular plan as follows:
>
> (1) The administrator shall furnish to each participant, and each beneficiary receiving benefits under the plan, a copy of the summary plan description, and all modifications and changes referred to in section 1022(a)(1) of this title --
>
> (A) within 90 days after he becomes a participant, or (in the case of a beneficiary) within 90 days after he first receives benefits, or
>
> (B) if later, within 120 days after the plan becomes subject to this part.
>
> * * *
>
> If there is a modification or change described in section 1022(a) of this title . . . a summary description of such modification or change shall be furnished not later than 210 days after the end of the plan year in which the change is adopted to each participant, and to each beneficiary who is receiving benefits under the plan.

Subsection 1024(b)(4) provides:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated.

The term "other instruments" in subsection (b)(4) has been construed by courts "as meaning, not any document relating to a plan, but formal documents that establish or govern the plan." *Brown v. American Life Holdings, Inc.*, 190 F.3d 856, 861 (8th Cir. 1999).

ERISA also provides the following penalty language:

> Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to [$110] a day from the date of such failure or refusal and the court may in its discretion order such other relief as it deems proper.  For purposes of this paragraph, . . . each violation described in subparagraph (B) with request to a single participant or beneficiary, shall be treated as a separate violation.

29 U.S.C. § 1132(c)(1).  In *Chestnut v. Montgomery*, 307 F.3d 698, 704 (8th Cir. 2002), the court wrote: "The employer's good faith and the absence of harm are relevant in deciding whether to award a statutory penalty."

The parties stipulated in their proposed Pretrial Order (Document No. 202) pertinent facts that pertain to whether Deere violated the above ERISA provisions.

On October 8, 2007, Michael Stohlmeyer sent an email to Duane Olson, Deere's Manager, Health & Welfare Plans, requesting copies of the various benefit plans including the Summary Annual Reports for the Salaried Pension Plan and the John Deere Health Benefit Plan for Retired Salary and Retired Non-Union Wage Employees for the fiscal years ending October 31, 2005 or December 31, 2005. (*See* Ex. 3035.)  Glenn Huston responded via email on October 14, 2007, attaching the summary annual reports for both Plans for fiscal year 2006.  The summary annual reports were also sent to Stohlmeyer via U.S. mail.  He did not receive all of Deere's benefit plans or the summary annual reports for fiscal year 2005.  (*See* Ex. 3036.)

On October 18, 2007, Stohlmeyer sent Huston another email repeating his request for copies of the 2004-2005 summary annual reports. (*See* Ex. 3037.)  In emails on October 18

and 20, 2007, Huston stated to Stohlmeyer that the 2005 summary annual reports were outdated and no longer provided to plan participants.  Huston stated that "[o]nly the current documents are provided to participants upon request since they are the relevant documents. This is consistent with [Department of Labor] requirements." *Id.*

In a letter dated November 6, 2007, Huston sent Stohlmeyer copies of the then current Salaried Health Plan and Plan 552, John Deere Health Benefit Plan for Retired Salary and Retired Non-Union Wage Employees.  (*See* Ex. 3039.)

In a November 8, 2007 e-mail, Stohlmeyer again requested copies of the 2004-2005 summary annual reports for whatever plans covered Stohlmeyer during the 2004-2005 time frame. (*See* Ex. 3040.)  Huston responded in a letter dated November 20, 2007, and enclosed the 2005 summary annual report for the Salaried Health Plan, the 2005 and 2006 summary annual reports for the Salaried Pension Plan, and the 2006 summary annual report for the Salaried Health Plan. (*See* Ex. 3042.)

On January 11, 2008, Stohlmeyer sent an email to Huston requesting information regarding the funding and terms of the VEBA. (*See* Ex. 3044.)  Huston responded in a letter dated January 18, 2008, and stated that information regarding the 401(h) and VEBA accounts was public information included in Deere's summary annual reports and annual report, and enclosed the Salaried Pension Plan; Plan 552, John Deere Health Benefit Plan for Retired Salary and Retired Non-Union Wage Employees; and the Deere & Company 2007 Annual Report. (*See* Ex. 3045.)

On or about January 27, 2008, Stohlmeyer emailed Huston requesting copies of the SPD and the Pension Plan that were in effect in 2001, the year Stohlmeyer retired.  That same

day, Huston responded by email advising Stohlmeyer that Deere would not provide him with this additional information.  (*See* Ex. 3046.)

In a letter dated November 9, 2007, Tom Grooms, a former Deere salaried employee, submitted a claim under the Salaried Health Plan, alleging that Deere violated the terms of the Salaried Health Plan when it launched the Healthy Directions program. (*See* Ex. 3041.)  On April 17, 2008, Plaintiffs' counsel sent a letter to Deere appealing the denial of Groom's claim and requesting documents "under which" the Salaried Health Plan, the John Deere Health Benefit Plan for Retired Salaried Employees and Retired Non-Union Wage Employees, and the Deere & Company Welfare Benefit Trust No. 2 "are or were established and maintained," including "all documents relevant to [Deere's] decision to deny Mr. Groom's claims." (*See* Ex. 3050.)  Plaintiffs' counsel requested 13 categories of documents including Plan documents, annual reports, actuarial reports, internal communications regarding Plan amendments, premium sharing, and documents related to AFI Benefits, covering the years 1963 to the present. *Id.*

John Leinart, Deere's Director of Compensation, Benefits and Integration, responded to Plaintiffs' counsel in a letter dated May 14, 2008, and agreed with Huston that Grooms did not have a claim for benefits under the Plan. (*See* Ex. 3051.)  Leinart declined to produce any of the documents identified in the categories outlined by Plaintiffs' counsel in the April 17, 2008 letter with the exception of the 2007 and 2008 Salaried Health Plans, the Plan's SPD, the most recent Annual Return/Report of Employee Benefit Plan, and the VEBA trust document. *Id.*

On July 1, 2008, Plaintiffs' counsel sent a letter to Deere regarding claims for benefits

on behalf of Flex Retirees who retired at different times from 1993 through 2007, explaining the basis of the claims and requesting "each and every SERP document between 1993 and 2007, any other Plan documents, Plan amendments and summary plan descriptions in effect from 1960 to the present." (*See* Ex. 3052.) Plaintiffs' counsel also requested the following documents "from 1960 to the present unless otherwise specified:" all trust agreements for each of the Plans; every Summary of Material Modification issued by the Plans or notices and/or communications to participants regarding changes to or amendments to the Plans; every complete annual report Form 5500 and every Summary Annual Report for the Plans from 1976 to the present; all actuarial reports and audited financial statements for the Plans from 1976 to the present; copies of all annual benefit statements furnished to Flex Retirees; copies of any documents furnished to Flex Retirees in connection with their retirement and decision to retire; all documents and communications regarding decisions and authority to amend, modify or terminate the Plans and decisions regarding the application of amendments to the Plans to existing employees and retirees; all other documents relevant to the decision by the Plans to change benefits effective January 1, 2008; complete information regarding the individual premiums, fees and charges paid by Flex Retirees and paid by the Plans or the Company on behalf of Flex Retirees and their spouses for each calendar year through 2007 and the monthly or other fees or premiums paid on behalf of Flex Retirees at present; copies of all contracts, agreements, presentations or proposals and other communications regarding AFI Benefits and copies of any agreements or schedules showing amounts paid to AFI by any of the insurance carriers that are providing benefits to Deere salaried employees or retirees; copies of any acknowledgment and consent to receive summary plan descriptions in electronic

format and all notices or explanations regarding the same; any and all other documents considered, reviewed, relied on or generated in connection with the denial of Flex Retirees' claims. *Id.*

In a letter dated July 25, 2008, Huston denied the request for documents except to provide a copy of the current pension plan. (*See* Ex. 3053.)

After consideration of these stipulated facts, along with all other pertinent evidence presented at trial, the court finds Deere satisfactorily complied with ERISA Section 1024(b). Deere in good faith informed employees and retirees in writing about provided currently operative governing plan documents, when plaintiffs made written requests.  The court agrees with Deere that section 1024(b) does not require a plan administrator to disclose historical documents.   Therefore, Deere was not required to produce copies of historical plan documents, historical SPDs or correspondence surrounding the SERPs.  Contrary to plaintiffs' vigorous argument to the contrary, Deere complied with the ERISA statutory language concerning mandatory disclosure of information.  The court will grant plaintiffs no relief under 29 U.S.C. § 1132(c)(1).

Judgment shall be entered in favor of Deere on all claims asserted in Count IV of the First Amended Class Action Complaint.

## V. JUDGMENT

The clerk of court shall enter judgment in favor of all Deere defendants and against all plaintiffs, dismissing this case, with taxable costs assessed to plaintiffs.[4]

IT IS SO ORDERED.

Dated October 16, 2009.

_____
CHARLES R. WOLLE, JUDGE
U.S. DISTRICT COURT

---

[4]At noon on November 23, 2009, the court will hold a hearing at the United States Courthouse in Davenport on any post-judgment motions filed by any of the parties.  The motions must be filed within the times provided in the Federal Rules of Civil Procedure.